1
2
3
4
5
6
7

8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

11   CHARLES MITCHELL, an individual on          No. 2:24-cv-02099-DJC-CSK
     behalf of himself and all others
12   similarly situated,

13                  Plaintiff,                    **ORDER**

14        v.

15   LINEAGE LOGISTICS SERVICES LLC, a
     limited liability company; and DOES 1
16   through 10, Inclusive,

17                  Defendants.

18

19        Pending before the Court is Defendant's Motion to Compel Arbitration.  (ECF

20   No. 16, hereinafter "Mot."; *see* ECF No. 1, Notice of Removal, Ex. A Class Action

21   Complaint, hereinafter "Compl.")  The Court held a hearing on October 31, 2024, and

22   took the matter under submission.  For the reasons set forth below, the Court will

23   GRANT in part and DENY in part Defendant's Motion to Compel Arbitration.  The

24   Court will stay the surviving claims pending the resolution of the arbitrated claims.

25                              **BACKGROUND**

26        Plaintiff Charles Mitchell was employed full-time by Defendant Lineage

27   Logistics Services LLC ("Lineage") from January 2023 through March 2024.  (Compl.

28

                                      1

1    ¶ 7.)  Defendant provides frozen food storage, packaging of client frozen goods for

2    delivery, and food transportation.  (Mot., Ex. A[1], Declaration of Marcy Bruskin,

3    hereinafter "Bruskin Decl." ¶ 2.)   Defendant operates distribution center warehouses

4    throughout the country, including one in Sacramento, California.  (*Id*.)

5         Plaintiff was employed at the Sacramento facility, and his work duties included

6    preparing shipments of goods to be sent to customers, which involved loading the

7    shipments onto a delivery truck.  (ECF No. 18, Opposition at 3, hereinafter "Opp'n.")

8    Plaintiff alleges that Defendant failed to pay regular wages by requiring off-the-clock

9    work, pay overtime wages, provide meal periods, authorize and permit rest periods,

10   timely pay final wages at termination, provide accurate itemized wage statements, and

11   indemnify employees for work-related expenditures.  (Compl. ¶¶ 31–77.)  Plaintiff

12   further alleges that these charges are in violation of California quota laws and the

13   Unfair Competition Law.  (*Id*. ¶¶ 79–94.)  Plaintiff brings this action for himself and on

14   behalf of a proposed class of similarly situated parties.

15        Plaintiff and Defendant allegedly entered into a Mutual Arbitration Agreement

16   ("MAA"), in which Plaintiff agreed to arbitrate all claims arising under the California

17   Labor Code and waived any right to bring a class action claim.  Defendant moves to

18   compel arbitration under the Federal Arbitration Act ("FAA") and California state

19   arbitration laws.  Plaintiff asserts that he was an employee engaged in interstate

20   commerce and is thus exempt from any binding arbitration agreement under the FAA.

21   Plaintiff also claims that his claims are exempt from California arbitration laws.

22        Plaintiff filed his Class Action Complaint (ECF. No. 1) on June 28, 2024, in the

23   Sacramento Superior Court, which was then removed to this Court by Defendant.  On

24   September 6, 2024, Defendant filed a Motion to Compel Arbitration (ECF No. 16), or

25   in the alternate, seeks to stay this action pending adjudication of *Felicia Saul v.*

26

27   [1] Plaintiff's motion includes two exhibits marked Exhibit A–the first is Plaintiff's Exhibit A, which includes
     the Bruskin Declaration, and the second is the Bruskin Declaration's own Exhibit A.  This citation is to
28   the first Exhibit A, which can be found at page 48 of the Motion.

1 | *Lineage Logistics Services, LLC, et al.*,2:24-CV-01331-DJC-CSK ("*Saul*"), a different
2 | case before this Court with nearly identical claims.[2]  The issue has been fully briefed.

3 | **I.    Legal Standard**

4 | The FAA governs arbitration agreements.  9 U.S.C. § 2.  Under the FAA, a
5 | signatory to an arbitration agreement may obtain an order directing a noncomplying
6 | party to arbitrate in the manner provided for in the agreement.  9 U.S.C. § 4.  In
7 | weighing a motion to compel arbitration, a court must determine: (1) whether a valid
8 | agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses
9 | the dispute at issue.  *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1017 (9th Cir.
10 | 2016) ("*Boardman*").  "Arbitration is a matter of contract, and the FAA requires courts
11 | to honor parties' expectations."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 351
12 | (2011) ("*Concepcion*").  But, the FAA's mandate of arbitration contract enforcement
13 | can be "overridden by a contrary congressional command."  *Shearson/Am. Exp., Inc. v.*
14 | *McMahon*, 482 U.S. 220, 226 (1987) ("*Shearson*").

15 | "When considering a motion to compel arbitration, a court applies a standard
16 | similar to the summary judgment standard" of Federal Rule of Civil Procedure 56.
17 | *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 804 (N.D. Cal. 2004) (citations
18 | omitted) ("*Concat*"); *see also Cox v. Ocean View Hotel* Corp., 533 F.3d 1114, 1119 (9th
19 | Cir. 2008) ("[D]enial of a motion to compel arbitration has the same effect as a grant of
20 | partial summary judgment denying arbitration . . . ."); *Greystone Nevada, LLC v.*
21 | *Anthem Highlands Cmty. Ass'n*, 549 F. App'x 621, 623 (9th Cir. 2013) (reversing an
22 | order compelling arbitration where opposing party had been afforded no opportunity
23 | to present evidence and argument).  The party opposing arbitration receives the
24 | benefit of any reasonable doubts and the court draws reasonable inferences in that
25 | party's favor, and only when no genuine disputes of material fact surround the
26 | arbitration agreement's existence and applicability may the court compel arbitration.

---

28 | [2] The *Saul* and *Mitchell* Orders are being issued concurrently, so the request to stay this proceeding pending *Saul* is moot.

1     *Concat*, 350 F. Supp. 2d at 804; *see Three Valleys Mun. Water Dist. v. E.F. Hutton &*

2     *Co., Inc.*, 925 F.2d 1136, 1141 (9th Cir. 1991).  Nevertheless, the decision to compel

3     arbitration is mandatory, not discretionary, if the requirements are met.  *Dean Witter*

4     *Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) ("*Dean*").  The FAA preempts state

5     laws that conflict with the purpose of the FAA by applying stricter requirements to

6     arbitration agreements than contracts generally.  *See Concepcion*, 563 U.S. at 343.

7     **II.    Discussion**

8        For the reasons set forth below, the Court finds that the evidence submitted by

9     Defendant sufficiently proves the existence of an arbitration agreement, signed by

10    Plaintiff, that encompasses the disputed issues.  However, the Court finds that Plaintiff,

11    due to his specific work duties, is covered by the FAA's transportation worker

12    exemption, and thus, the FAA cannot be used to mandate compliance with the

13    agreement.  The Court further finds that two causes of action are not covered by the

14    arbitration agreement under California arbitration laws.  Accordingly, the Court will

15    not compel Plaintiff to arbitrate those specific claims against Defendant.  Further, the

16    Court finds that the class action waiver is not valid, and thus, the remaining claims can

17    proceed on a class basis, pending the resolution of the arbitrated claims.

18    **1.  Existence of a valid arbitration agreement that encompasses the**

19        **disputed issues**

20        As an initial step, the Court must determine: (1) whether a valid agreement to

21    arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at

22    issue.  *Boardman*, 822 F.3d at 1017.  The party seeking to compel arbitration bears the

23    burden of proving by a preponderance of the evidence the existence of an agreement

24    to arbitrate.  *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014).  In

25    resolving a motion to compel arbitration, "[t]he summary judgment standard [of

26    Federal Rule of Civil Procedure 56] is appropriate because the district court's order

27    compelling arbitration 'is in effect a summary disposition of the issue of whether or not

28    there had been a meeting of the minds on the agreement to arbitrate.'"  *Hansen v.*

1    *LMB Mortg. Servs., Inc.*, 1 F. 4th 667, 670 (9th Cir. 2021) (internal quotations omitted).

2    "When deciding whether the parties agreed to arbitrate a certain matter . . ., courts

3    generally . . . should apply ordinary state-law principles that govern the formation of

4    contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). "Mutual

5    assent is determined under an objective standard applied to the outward

6    manifestations or expressions of the parties, i.e., the reasonable meaning of their

7    words and acts, and not their unexpressed intentions or understandings." *Alexander*

8    *v. Codemasters Grp. Ltd.*, 104 Cal. App. 4th 129, 141 (2002), disapproved of on other

9    grounds by *Reid v. Google, Inc.*, 50 Cal. 4th 512, 524 (2010).

10        Defendant alleges that Plaintiff electronically signed an arbitration agreement,

11    entitled "Mutual Arbitration Agreement," on October 18, 2023. (Mot. at 1.) As proof

12    of this, Defendant offers the declaration of Marcy Bruskin, who is the Vice President of

13    Human Resources Operations for Lineage and who has "personal knowledge" about

14    the company's onboarding protocols. (Bruskin Decl. ¶ 4.) In her declaration, Bruskin

15    avers that at the time of hire, employees are provided with copies of Lineage's various

16    policies, including the MAA. (*Id.* ¶ 6.) According to Bruskin, new employees "can take

17    as much time as desired to review any of the documents before" signing them and

18    that they may ask human resources personnel any questions related to those

19    documents. (*Id.* ¶ 7.) Onboarding documents are presented and signed via a

20    program called Workday, which requires new employees to create a unique password

21    to access company documents. (*Id.* ¶¶ 4–6.) An employee's password is not viewable

22    or otherwise accessible by company staff. (*Id.* ¶ 5.)

23        Bruskin claims that she has "personally reviewed documents concerning

24    Plaintiff that are maintained . . . in the normal course of business" and that based on

25    that review, Bruskin knows that Plaintiff accessed the MAA and clicked the "'I agree'

26    box next to the signature statement for that document." (*Id.* ¶¶ 9, 12.) Attached to

27    Bruskin's declaration is an "Exhibit A" (*id.* at 7–10), which is a copy of the MAA, and an

28

5

1    "Exhibit B," which is an electronic signature from Plaintiff Mitchell acknowledging his
2    agreement to the MAA (*id.* at 11-12).

3         Here, no reasonable inference can be drawn in Plaintiff's favor that the
4    arbitration agreement does not exist or was not formed. Plaintiff provides no
5    evidence that the Agreement does not exist; he only provides his own declaration that
6    he does not remember signing the Agreement and disputes that any signature was
7    added by him. (ECF No. 18, Declaration of Plaintiff, hereinafter "Mitchell Decl." ¶ 16.)
8    Meanwhile, Defendant presents sufficient evidence to substantiate the existence of
9    the Agreement, signed by Plaintiff. Bruskin's declaration avers that only employees
10   themselves may access their Workday account to sign documents, and that the MAA
11   was one of those documents. (Bruskin Decl. ¶¶ 4-6.) Defendant also attaches a
12   signature confirmation page indicating that Plaintiff Mitchell's account was used to
13   sign the MAA (*id.* at 12) and a declaration from Lineage's Director of Human
14   Resources Joanna Murphy and Site Trainer Joseph Larzelere, documenting the
15   location where and exact time the MAA was signed and Plaintiff Mitchell's Workday
16   account history, which shows he was active on Workday when the Agreement was
17   signed. (ECF No. 20, Declaration of Joseph Larzelere, hereinafter "Larzelere Decl." ¶
18   7; Declaration of Joanna Murphy Ex. F and G.) Plaintiff's mere statement that he "does
19   not recall" seeing or signing the document (Mitchell Decl." ¶ 16) is insufficient to
20   create a material question of fact in light of Defendant's evidence to the contrary, even
21   when considering all evidence in the light most favorable to Plaintiff.

22         Plaintiff does not contest that the MAA, if it is valid, encompass the types of
23   claims brought here. Nor can he. The text of the agreement explicitly mentions the
24   claims brought in this case–employment claims related to wages, overtime, breaks,
25   reimbursement, and violations of state law. (See Bruskin Decl. Ex. A ("Claims subject
26   to this Agreement include all claims involving your employment or other relationship
27   with the Company, including during the application and background check process,
28   during employment, at separation, or after the relationship ends. This includes without

1    limitation any and all claims for discrimination, harassment, or retaliation; wages,

2    overtime, breaks, reimbursement, or any other compensation; breach of any express

3    or implied contract; negligence or other tort; or violation of any federal, state, or local

4    law.").)  The only conclusion that can be drawn from the text of the Agreement is that

5    the parties intended the Agreements to cover the types of claims raised in the present

6    action.

7         The Court concludes that Defendant has met its burden of showing by a

8    preponderance of evidence that a valid arbitration agreement exists (the Mutual

9    Arbitration Agreement), that the parties agreed to the arbitration agreement, and that

10   the Agreement encompasses the disputed issues.

11       **2.  The Federal Arbitration Act generally requires courts to enforce**

12           **arbitration agreements**

13        The FAA establishes a strong federal policy favoring arbitration, requiring

14   courts to "rigorously enforce agreements to arbitrate."  *Shearson*, 482 U.S. 220 at 226,

15   quoting *Dean*, 470 U.S. at 221.  Under the FAA, arbitration agreements shall generally

16   be "valid, irrevocable, and enforceable."  9 U.S.C. § 2.  Courts shall "enforce covered

17   arbitration agreements according to their terms," and any "ambiguities about the

18   scope of an arbitration agreement must be resolved in favor of arbitration."  *Lamps*

19   *Plus v. Varela,* 587 U.S. 176, 178, 189 (2019).

20        The terms of the arbitration agreement agreed to by Plaintiff explicitly specify

21   the signatories' intent that those agreements be governed by the FAA.  (*See* Bruskin

22   Decl. Ex. A ("This Agreement is governed by the Federal Arbitration Act, 9 U.S.C. § 1

23   et seq.").)  Given the agreement's express identification of the FAA as the governing

24   statute and the general principle that the FAA governs arbitration agreements, the

25   Court concludes that there is a presumption that the agreement is enforceable under

26   the FAA absent a statutory exception indicating otherwise.

27   ////

28   ////

7

1        **3.  Exemption to the Federal Arbitration Act for workers engaged in**

2            **interstate commerce**

3        Although there is a strong presumption in favor of enforcing arbitration

4 agreements, "the Arbitration Act's mandate may be overridden by a contrary

5 congressional command." *Shearson*, 482 U.S. at 226.  One such contrary

6 congressional command is section 1 of the FAA, under which a court shall exempt

7 "contracts of employment of seamen, railroad employees, or any other class of

8 workers engaged in foreign or interstate commerce" from the binding nature of

9 arbitration agreements.  *See* 9 U.S.C. § 1.  There are two key cases that provide

10 context of the definition of an employee engaged in interstate commerce within the

11 meaning of the FAA.

12        First is *Sw. Airlines Co. v. Saxon*, 596 U.S. 450 (2022) ("*Saxon*"), which laid out a

13 two-step process for analyzing exemption claims under 9 U.S.C. § 1, which it referred

14 to as a "transportation worker exemption."  There, the Supreme Court instructed

15 courts to: (1) determine the relevant class of workers to which the plaintiff belongs,

16 and (2) determine whether that class is engaged in foreign or interstate commerce.

17 *Saxon*, 596 U.S. at 455.  *Saxon* involved an employee of Southwest Airlines whose

18 work responsibilities required her to load and unload baggage, airmail, and

19 commercial cargo on and off airplane that traveled across the country.  *Id.* at 453–54.

20 The plaintiff sued Southwest for failure to pay overtime wages and sought to resist

21 arbitrating her claim with Southwest by claiming the transportation worker exemption.

22 *Id.* at 454.

23        The Supreme Court began by confronting the threshold question of how to

24 define a "class of workers."  *Id.* at 455.  To answer this question, it focused on the

25 specific work duties of the plaintiff, rather than the general industry she worked in or

26 the title of her position.  *Id.* at 456–57.  The high court reasoned that even though the

27 plaintiff was employed within the airline industry, which undoubtedly would include at

28 least some transportation workers, she still needed to show that her specific duties

1    qualified her own position as a transportation worker. *Id.* at 456. Looking solely at the

2    plaintiff's work duties, the Supreme Court determined that she belonged to a class of

3    worker who "physically load and unload cargo on and off planes." *Id.*

4        Next, the Supreme Court weighed whether that class was engaged in foreign

5    or interstate commerce under 9 U.S.C. § 1. *Id.* The Supreme Court reasoned that

6    because the plaintiff handled cargo that was travelling in interstate commerce, she

7    herself was, as "a practical matter, part of the interstate transportation of goods." *Id.* at

8    457–58. In other words, a worker that "play[s] a direct 'and necessary role in the free

9    flow of goods across borders," or is" actively 'engaged in transportation' of those

10   goods across borders via the channels of foreign or interstate commerce" can be a

11   "transportation worker" under 9 U.S.C. § 1. *Id.* at 458, quoting *Circuit City Stores, Inc.*

12   *v. Adams*, 532 U.S. 105, 115 (2001). Because the plaintiff's loading and unloading of

13   the cargo planes was sufficiently linked to the transportation of goods in interstate

14   commerce, the plaintiff qualified under the transportation worker exemption.

15       The second case is *Ortiz v. Randstad Inhouse Servs., LLC,* 95 F.4th 1152 (9th Cir.

16   2024), in which the Ninth Circuit held that warehouse workers who received and

17   processed goods from international locations that were then shipped to destinations

18   in various U.S. states were similarly covered under the transportation worker

19   exemption in 9 U.S.C. § 1. The plaintiff in *Ortiz* was tasked with moving boxes inside

20   of and preparing packages to be shipped out of a specific warehouse. *Id.* at 1158.

21   When the plaintiff sued the warehouse operator, the operator moved to compel

22   arbitration, citing an arbitration agreement signed by the parties. *Id.* The Ninth

23   Circuit first addressed the issue as to which class the plaintiff belonged, defining that

24   class as one consisting of workers handling goods as they progressed through the

25   supply chain. *Id.* at 1161. Noting that the plaintiff was responsible for the movement

26   of packages within the facility that were tied to interstate commerce, the Ninth Circuit

27   then reasoned that the plaintiff's work was sufficiently tied to those items' travel, and

28   thus, the plaintiff was a transportation worker. *Id.* at 1161–62. Even though the

1   plaintiff's work was localized to a single facility, the products that moved through the

2   warehouse were destined for myriad locations, including out-of-state destinations,

3   and thus the local nature of the employee's work was not controlling.  *Id.* at 1162 ("If

4   *Saxon* stands for anything, it is that an employee is not categorically excluded from the

5   transportation worker exemption simply because he performs his duties on a purely

6   local basis.")  Because the plaintiff was a worker who was sufficiently implicated in the

7   chain of interstate commerce, he was exempt from federal enforcement of the

8   arbitration clause under 9 U.S.C. § 1.

9       For 9 U.S.C. § 1's exemption to apply, the Plaintiff in the present matter must

10  show that he is sufficiently linked to the movement of goods in interstate commerce as

11  the plaintiffs in *Saxon* and *Ortiz*.

12  ### 4.  Plaintiff's supply chain job plays a tangible and meaningful role in the

13  ### movement of goods through interstate commerce

14      Because Plaintiff seeks relief under the transportation worker exemption in 9

15  U.S.C. § 1, the Court must first identify the class of workers to which Plaintiff belongs.

16  Although Defendant provides "food transportation in multiple states throughout the

17  United States" (Bruskin Decl. ¶ 2), it is the specific nature of Plaintiff's work, rather than

18  the employer's, that is the basis for any qualification as a transportation worker.  At a

19  minimum, Plaintiff and Defendant agree that Plaintiff's work duties included

20  organizing boxes so that they could be sent to storage or picked up by a third-party

21  delivery company.[3]  Under this framing, Plaintiff's class would be that of a worker who

22  is tasked with organizing boxes as they are prepared for storage within the warehouse

23  facility or for shipment outside the warehouse to various locations.

24      This meets the requirements of *Ortiz*: whether "an employee's relationship to

25  the movement of goods [is] sufficiently close enough to conclude that his work plays a

26

27  [3] There is a factual dispute as to Plaintiff's work duties.  (Compare Mitchell Decl. ¶ 5 with ECF No. 16,
    Declaration of Luis Vargas ¶ 6–8.)  The Court need not resolve this dispute, as even the narrower scope
28  of duties is sufficient to bring Plaintiff within the ambit of 9 U.S.C. § 1.

1  tangible and meaningful role in their progress through the channels of interstate

2  commerce." *Ortiz*, 95 F. 4th at 1160.  Here, Plaintiff's responsibilities are meaningfully

3  tied to the movement of goods into interstate commerce.  The role of preparing

4  boxes for egress from the facility or organizing them for storage before they are ready

5  to be shipped is necessary to the subsequent transit of those goods out of the facility.

6  In other words, those goods cannot be transported without the workers like Plaintiff

7  who organize them for shipment.

8         Turning to the question of how those goods enter the channels of interstate

9  commerce, the Court finds that Defendant's Sacramento warehouse is sufficiently tied

10  to the travel of goods through channels of interstate commerce.  Plaintiff asserts that

11  when he organized packed boxes in the Sacramento facility, he witnessed a large

12  number of them marked for travel to destinations outside of California.  (Mitchell Decl.

13  ¶¶ 5–7.)  In response, Defendant argues that the shipment of goods from the

14  Sacramento facility "were primarily destined for locations in California," but does not

15  contest that the facility still regularly sent goods to out-of-state destinations.  (*See* ECF

16  No. 16, Declaration of Luis Vargas ¶ 9.)  But again, the parties' disagreement does not

17  matter—even if a majority of the goods shipped from Defendant's Sacramento facility

18  were to be destined for intrastate rather than interstate commerce as Defendant

19  claims, the facility is routinely sending shipments to out-of-state locations and is thus

20  tied to the flow of goods out of California under either party's framing.  (*See id*.)

21         Thus, the Court finds that Plaintiff is a member of a class that is linked to the

22  travel of goods through interstate commerce and thus, that he qualifies under the

23  transportation worker exemption.

24         **5.  In the absence of the Federal Arbitration Act, California arbitration laws**

25             **govern**

26         The text of the agreement agreed to by the parties in this litigation expressly

27  provides that California state law controls if the FAA is found not to apply.  (Bruskin Ex.

28  A ("[I]f the FAA is found not to apply [to the Mutual Arbitration Agreement], then the

1   arbitration law of the state in which Employee is employed or was last employed by
2   the Company will apply.").)  Finding that the FAA does not apply, the Court next turns
3   to whether California arbitration laws require Plaintiff to arbitrate his claims.  The Court
4   finds that California arbitration laws permit two of Plaintiff's causes of action to
5   proceed on a class basis.

6       California has a "strong public policy in favor of arbitration as a speedy and
7   relatively inexpensive means of dispute resolution."  *Ericksen, Arbuthnot, McCarthy,*
8   *Kearney & Walsh, Inc. v. 100 Oak St.*, 35 Cal. 3d 312, 322 (1983).  Like the FAA, the
9   Court must enforce the arbitration clause under state law unless a specific exemption
10  applies.  Plaintiff raises two such exemptions here.  First, Plaintiff points to California
11  Labor Code section 229, under which "[a]ctions to enforce the provisions of this article
12  [sections 200 to 244] for the collection of due and unpaid wages claimed by an
13  individual may be maintained without regard to the existence of any private
14  agreement to arbitrate."  Second, Plaintiff relies on *Gentry v. Superior Court*, 42 Cal.
15  4th 443 (2007), abrogated on other grounds by *Concepcion*, 563 U.S. 333, for the
16  proposition that the class action waiver in his arbitration agreement is unenforceable.

17      Plaintiff raises a number of claims related to his employment with Defendant
18  that potentially come within the ambit of Labor Code section 229.  Those claims
19  specifically include alleged violations of: (1) Labor Code sections 204, 1194, 1197
20  (failure to pay wages), (2) Labor Code sections 1194, 1198 (failure to pay overtime
21  wages); (3) Labor Code sections 226.7 and 512 (failure to provide meal breaks or
22  compensation in lieu thereof), (4) Labor Code sections 226.7 (failure to authorize and
23  permit rest breaks or compensation in lieu thereof), (5) Labor Code sections 201, 202,
24  and 203 (failure to pay all wages due upon termination), (6) Labor Code section 226
25  (failure to provide accurate wage statements), (7) Labor Code section 2802 (failure to
26  reimburse expenses), and (8) Business and Professions Code section 17200 et seq.
27  (violation of the Unfair Competition Law).

28      Plaintiff's first and fifth causes of actions pertain to the alleged nonpayment of

12

1    wages by Defendant brought under Article I of the Labor Code and are therefore

2    exempted from mandatory arbitration under Labor Code section 229.  However,

3    Plaintiff's second, third, fourth, sixth, seventh, and eighth claims are brought under

4    different provisions of the Labor Code, and thus are not subject to section 229's

5    application.  *Lane v. Francis Capital Mgmt. LLC*, 224 Cal. App. 4th 676, 684 (holding

6    that section 229 applies only to sections 200 through 244 because "[s]ection 229 is

7    found in article 1 of division 2, part I, chapter 1 of the Labor Code, encompassing

8    sections 200 through 244").

9          Plaintiff argues that under the Supreme Court's decision in *Naranjo v. Spectrum*

10   *Sec. Services, Inc*., 13 Cal. 5th 93 (2022), the remaining claims are in fact claims for

11   unpaid wages and therefore covered by Labor Code section 229.  In *Naranjo*, plaintiffs

12   had sued for a violation of state meal break requirements under an Industrial Welfare

13   Commission wage order.  *Id*. at 102.  Pursuant to Labor Code section 226.7, plaintiffs

14   sought an additional hour of pay for each day on which the defendant failed to

15   provide the legally required break.  *Id*. at 102–03.  On review, the issue was whether

16   the failure to give the "premium pay" required by section 226.7(c) also constituted a

17   failure to pay the wages of an employee who is discharged or quits under Labor Code

18   section 203.  *Id*. at 105.  While the California Supreme Court recognized that the

19   premium pay is in part a penalty, it concluded that pay owed under section 226.7 "can

20   equally be viewed as wages."  *Id*. at 107.  Accordingly, the Court concluded that

21   "missed-break premium pay constitutes wages for purposes of Labor Code section

22   203, and so waiting time penalties are available under that statue if the premium pay

23   is not timely paid."  *Id*. at 117.

24         In reaching its conclusion, the California Supreme Court distinguished a prior

25   case, *Kirby v. Immoos Fire Prot., Inc*., 53 Cal. 4th 1244 (2012).  In *Kirby*, the California

26   Supreme Court concluded that an action brought under Labor Code section 226.7

27   was not an "action brought for the nonpayment of wages" for purposes of the attorney

28   fee provision in Labor Code section 218.5(a).  *Id*. at 1255.  Rather, the court

13

1    concluded, "a section 226.7 action is brought for the nonprovision of meal and rest

2    periods, not for the 'nonpayment of wages.'"  *Id*. (emphasis omitted).  While some

3    lower state courts had read *Kirby* to suggest that "the legal violation underlying a

4    section 226.7 claims is . . . not the nonpayment of wages," *Naranjo*, 13 Cal. 5th at 111

5    (internal citations omitted), the California Supreme Court rejected that conclusion and

6    highlighted the different inquiry that was the subject of *Kirby*:

7         *Kirby* explained that our prior conclusion that premium pay is a wage
          did not necessarily mean that an action under section 226.7 is an action
8         for nonpayment of wages under section 218.5. The characterization of
          the nature of an action under section 218.5 turns instead on the nature
9         of the underlying legal violation the action seeks to remedy, not the
          form of relief that might be available to cure that violation.
10

11

12   *Naranjo*, 13 Cal. 5th at 111.  That is to say, while *Kirby* was concerned with the "action"

13   as that term was understood in section 218.5, *Naranjo* was concerned with what

14   constituted "wages" for purposes of section 203.

15        The inquiry in this case is similar to that in *Kirby*: what constitutes an "*action to

16   enforce the provisions* of this article for the collection of due and unpaid wages

17   claimed by an individual" for purpose of Labor Code section 229.  The fact that a

18   remedy may constitute wages for purposes of *Naranjo* is simply irrelevant in

19   determining whether the <u>action</u> is brought to enforce the provisions of Article I of the

20   Labor Code.  While not binding on this Court, the Ninth Circuit's unpublished decision

21   *Morales v. U.S. Dist. Ct. for Cent. Dist. of Cal., L.A.*, No. 24-536, 2024 WL 3565262 (9th

22   Cir. July 29, 2024), reflects this same distinction.  *Id*. at *3 ("By clearly distinguishing

23   between the violation (no breaks) and the remedy (extra compensation), *Naranjo* did

24   not recharacterize a claim for meal-and-rest-break violations as an action to collect

25   unpaid wages.")  These cases illustrate that in addition to being for the collection of

26   due and unpaid wages (as that term is understood in *Naranjo*), an action for

27   enforcement under section 229 must have a statutory basis in Article I of the Labor

28   Code.  Only Plaintiff's causes of action one and five meet this requirement.  Therefore,

1  Defendant may validly seek to arbitrate Plaintiff's second, third, fourth, sixth, seventh,

2  and eighth claims consistent with Labor Code section 229.  As Plaintiff does not

3  identify any other exemption that would apply to those claims, they must be arbitrated

4  pursuant to California law.

5      While the first and fifth causes of action are not subject to arbitration, the Court

6  must also consider whether the class action waiver for these claims is valid under the

7  California Supreme Court's decision in *Gentry*.  The party seeking to invalidate a class

8  action waiver must provide a "proper factual showing" for the Court.  *Gentry*, 42 Cal.

9  4th at 466.  *Gentry* outlines four factors to be considered by courts when weighing

10  class action exemptions in arbitration agreements:  (1) "the modest size of the

11  potential individual recovery"; (2) "the potential for retaliation against members of the

12  class"; (3) "the fact that absent members of the class may be ill informed about their

13  rights"; and (4) "and other real world obstacles to the vindication of class members'

14  right[s]."  *Id.* at 463–64.  If, after considering these factors, the court finds that a class

15  waiver "will likely lead to a less comprehensive enforcement of overtime laws" and that

16  class proceedings would be "a significantly more effective practical means of

17  vindicating the rights of the affected employees," the agreement's class prohibition is

18  unenforceable.  *Id.* at 463.

19      First, Plaintiff's claims are modest and would lead to moderately low recovery

20  (approximately $7,044 at an individual level).  (Opp'n. at 13.)  *Gentry* itself provides a

21  helpful data point in weighing recovery amounts, citing with approval a case in which

22  an *individual* claim "as large as $37,000" was found to be an insufficient incentive for

23  individual actions under this factor.  *Gentry*, 42 Cal. 4th at 458 (citing *Bell v. Farmers*

24  *Ins. Exch.*, 115 Cal. App. 4th 715, 745 (2004)).  Plaintiff here is paid a relatively low

25  salary and the unpaid wages he is suing for stem from a specific and limited period of

26  time, and would likely result in a potential recovery lower than the $37,000 that *Gentry*

27  believed was a modestly low recovery.  Additionally, he is suing on behalf of a class of

28  workers in single factory, which necessarily limits the size of the class and of the

15

1    potential payout.  After weighing these considerations, the Court finds the first *Gentry*

2    factor is in Plaintiff's favor.

3    The second factor related to potential retaliation also weighs in Plaintiff's favor.

4    In his declaration, Plaintiff Mitchell attests to several instances of retaliation for making

5    employment-related complaints.  (Mitchell Decl. ¶ 11.)  For example, he declares that

6    his supervisor directly linked making adverse complaints to Lineage's human

7    resources department with being fired.  (*Id.*)  Further, he states that a temporary

8    employee who threatened to sue for meal break issues was later terminated.  (*Id.*)

9    And finally, he asserts that supervisor Luis Vargas, whose declaration is included in

10   Defendant's briefing, threatened to assign Plaintiff and other employees to a less-

11   desirable position if they made complaints or otherwise upset him.  (*Id.*)

12   Defendant contests Plaintiff Mitchell's framing of the workplace environment.

13   But Defendant's claims, at least at this stage, are unavailing.  For example, Defendant

14   cites to the fact that it has an anonymous complaint hotline and that there is a record

15   of Plaintiff using that hotline (after he had already been fired), yet Plaintiff did not

16   subsequently submit a retaliation complaint.  (ECF No. 20, Declaration of Steven

17   Rosso ¶¶ 2–5 and Ex. A. at 7 (discussing confidential hotline).)  But it is apparent that

18   the hotline is not anonymous, as Defendant's briefing acknowledges that Lineage

19   Human Resources Director Steven Rosso receives the name of the employee who

20   makes a workplace related claim.  (*Id.* ¶¶ 4, 5.)  And even if an employee does not

21   submit a retaliation claim against an employer, it does not mean that there is not a

22   culture of retaliation against workers or that workplace retaliation did occur.  It would

23   merely mean that an employee, for whatever reason (*including* fear of further

24   retaliation or that they no longer work for Lineage), did not submit a complaint.  The

25   Court finds that Plaintiff's allegations and declaration on this issue is sufficient to sway

26   the second *Gentry* factor in his favor.

27   Under the third factor, whether the class members would be informed of their

28   rights, Plaintiff similarly provides satisfactory proof via his declaration.  He attests that

16

1   "[w]hile working for Lineage, I did not fully understand my rights as an employee and

2   Lineage did not sufficiently inform me of those rights. For example, even though I felt

3   that I was not getting paid for all of the hours that I worked and [was] not receiving all

4   of my meal breaks and rest breaks on time, I did not know all of the rights that I was

5   required to receive under California law." (Mitchell Decl. ¶ 10.)  Defendant rebuts this

6   by arguing that Plaintiff cannot know that his rights are being violated without being

7   informed of those rights.  (ECF No. 20, Reply at 11.)  The Court rejects this framing.  A

8   person can understand that their workplace rights are being violated even if they

9   cannot articulate exactly how many minutes they are entitled to for rest and meal

10  breaks or what information their employer-given wage statement must have on it.

11  And this is exactly what Plaintiff contends—that he felt something was wrong, but was

12  not informed of his exact rights.  In its defense, Defendant also argues that it

13  conducted "regular policy training" at the facility.  (Larzelere Decl. ¶ 10.)  But it is

14  unclear how regularly this training occurred or whether it occurred during Plaintiff's

15  limited time at the company.  Nor is it apparent what areas, in addition to meal and

16  rest break policies, this training covers (e.g., wage reporting requirements, worker

17  reimbursement for work-related expenses, Unfair Competition Law).  After weighing

18  both sides' arguments, the Court finds that the third *Gentry* factor is in Plaintiff's favor.

19      Plaintiff has a harder time substantiating the last *Gentry* factor related to real

20  world obstacles to vindicating class members' rights.  While the Court recognizes

21  there are numerous barriers to potential plaintiffs levying claims against their

22  employers, Plaintiff provides no declaration or supporting evidence that these barriers

23  exist here, other than pointing to the arbitration agreement at issue.  The Court finds

24  that the fourth *Gentry* factor is not sufficiently substantiated by Plaintiff, and thus finds

25  this factor weighs in favor of the class waiver's validity.  But while this factor does not

26  fall in Plaintiff's favor, a court need not give it weight if the first three *Gentry* factors are

27  found to support the Plaintiff.  *Sanchez v. W. Pizza Enterprises, Inc.*, 172 Cal. App. 4th

28  154, 171 n.7 (2009), abrogated on other grounds by *Concepcion*, 563 U.S. 333.

1    After weighing the *Gentry* factors, the Court finds that disallowance of the

2 remaining class-based claims to proceed "will likely lead to a less comprehensive

3 enforcement of overtime laws" and that class proceedings would be "a significantly

4 more effective practical means of vindicating the rights of the affected employees."

5 *Gentry*, 42 Cal. 4th at 463.[4]  Accordingly, Plaintiff is entitled to bring his first and fifth

6 causes of action on a class basis.  While the Court finds that some of Plaintiff's claims

7 are not bound by arbitration, those claims must be stayed pending the resolution of

8 the claims that must be arbitrated.  *See Muller v. Roy Miller Freight Lines, LLC*, 34 Cal.

9 App. 5th 1056, 1070 (2019).

10                              **CONCLUSION**

11    In accordance with the above, Defendant's Motion to Compel Arbitration (ECF.

12 No. 16) is GRANTED in part and DENIED in part.  Plaintiff may proceed with his first

13 and fifth causes of action on a class basis, and must arbitrate his second, third, fourth,

14 sixth, seventh, and eighth causes of action.  Plaintiff's claims not destined for

15 arbitration are ordered STAYED pending the resolution of the arbitration

16 proceedings.  IT IS SO ORDERED.

17

18    IT IS SO ORDERED.

19 Dated:   **February 27, 2025**

20                                           Hon. Daniel J. Calabretta
                                            UNITED STATES DISTRICT JUDGE

21

22

23 DJC5 – Mitchelll24cv02099.mtca

24

25

26

27

---

28 [4] While the plaintiff in *Saul* alleges nearly identical claims, the evidence provided in that suit does not sufficiently satisfy the *Gentry* factors as done by the plaintiff in this case.